plaint must be dismissed, and a decision may be prepared in ac cordance with the foregoing.

Complaint dismissed.

---

(34 Misc. Rep. 450.)

### CROOKS v. PEOPLE'S NAT. BANK.

(Supreme Court, Trial Term, Franklin County. April, 1901.)

**1. BANKRUPTCY—PREFERENTIAL TRANSFERS.**

Defendant bank discounted for a firm certain of its drafts, upon which the acceptor was insolvent. In order to secure the bank, the acceptor made a demand note to one P., who indorsed the note for accommodation. The next day the senior partner of the firm transferred certain securities to him to secure him for his indorsement. The firm then indorsed the note and delivered it to the bank, which at the time had no reason to believe that a preference had been given it over other creditors. The firm filed a petition in bankruptcy two days thereafter. The senior member of such firm was also president of the bank, but not its manager. *Held*, in an action by his trustee in bankruptcy, who was also trustee of the firm, that the securities transferred by the firm to P. did not constitute a preference, so as to be void under Bankr. Act 1898, § 60b.

**2. SAME.**

The senior member of such firm transferred a mortgage to his son as security for a note made by said son and indorsed by a third party. The note was given to the firm, which discounted the same at defendant's bank, and with the proceeds thereof paid certain overdrafts. *Held* not to constitute a preference, within the bankruptcy act.

**3. SAME—SECURING INDORSEMENT.**

Where a responsible person indorses a note for accommodation, receiving at the time certain securities in good faith, having made himself absolutely liable on the note, he is entitled to retain the securities for his own reimbursement on the subsequent bankruptcy of the maker of the note.

**4. BANKS—KNOWLEDGE OF PRESIDENT.**

The knowledge of the president of a bank as to his own insolvency, or that of a firm with which he was connected, could not be imputed to the bank receiving securities in connection with certain overdrafts and loans of the president, where such president dealt with the bank in regard to his own affairs as with a third party.

Action by George W. Crooks, trustee in bankruptcy of H. E. King and of the firm of H. E. King & Son, against the People's National Bank. Complaint dismissed.

John P. Badger, for plaintiff.

M. E. McClary (John P. Kellas, of counsel), for defendant.

HOUGHTON, J. The plaintiff is trustee in bankruptcy of the estates of Howard E. King and of the firm of Howard E. King & Son, bankrupts. The Kings filed a voluntary petition in bankruptcy on the 16th day of February, 1899, and on the 18th day of February they were adjudged bankrupts. One Searles, who was a hop broker, and the Kings had had dealings. The Kings had bought hops and shipped them to Searles, and drawn drafts through the defendant bank upon him, which he had accepted, and which were discounted by the defendant. Some of these drafts had been protested and remained overdue. Many of them had been renewed, and some of them were

not due. The aggregate of these drafts was $12,064.35 on the 14th of February, 1899. Howard E. King was president of the defendant. In the January previous, a bank examiner had visited the defendant bank, and complained that these drafts were one-name paper, and should not be carried by the bank. This investigation by the examiner led to a letter from the comptroller of the currency on the 25th of January to the bank, directing that these drafts, with other paper made by the Kings, be taken care of in some different manner. Mr. Marshall, who was the vice president and acting manager of the defendant, called Howard E. King's attention to the situation, and requested him to put the drafts in some different shape. King expressed a willingness to do so, remarking that, as he was at the head of the institution, he desired his paper to be beyond criticism. He made arrangement with Mr. Thomas Cantwell to indorse a note to take up these drafts, but that arrangement was not perfected by the giving of a note. On the 14th of February, 1899, Mr. Searles being at Malone, where King resided and the defendant bank was located, Mr. Marshall again called Mr. King's attention to the fact that the drafts ought to be put in different shape; and Mr. King remarked that he could not then do it, because Cantwell was not in town. Mr. Frederick G. Paddock was passing by, and Mr. King asked if Paddock would not do as well. Marshall answered in the affirmative, and, at King's request, asked Paddock if he would indorse King's note if King would give him security; and Paddock answered that he would, whether he gave him security or not. Thereupon Searles made his note payable to Paddock for $12,064.35, due on demand; and Paddock indorsed it, waiving demand and notice of protest. King then, or next day, gave Paddock certain bank stock and water company stock as security for his indorsement, which is of the conceded value of $10,050. H. E. King & Son indorsed said note and delivered it to the defendant. It will be seen that the effect of this transaction was to charge Paddock absolutely with the payment of the note, as though payment had been immediately demanded, refused, and notice given. The petition in voluntary bankruptcy is claimed to have been precipitated by the action of the Farmers' National Bank on the 15th of February, threatening to institute proceedings for involuntary bankruptcy against the Kings unless the paper in that bank was immediately met. The Kings conferred with friends, and concluded that it would be better for all concerned that they forestall the involuntary proceedings by a voluntary petition, which was accordingly done. The defendant demurred to the plaintiff's complaint, and that demurrer was sustained at special term. An appeal to the appellate division resulted in a reversal and a holding that the plaintiff's complaint stated a good cause of action. Crooks v. Bank, 46 App. Div. 335, 61 N. Y. Supp. 604.

The bankruptcy law (section 60b) provides:

"That if the bankrupt shall have given a preference within four months before the filing of a petition, or after the filing of the petition and before the adjudication, and the person receiving it, or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property or its value from such person."

The allegations of the complaint, and the theory upon which the plaintiff seeks to recover, are that Searles was insolvent, and that King & Son gave Paddock, the accommodation indorser, security for his indorsement, thereby depleting their estate and making the note a thing of value, to the extent of the securities, at least, and thereupon delivered it to the defendant, thus giving the defendant a preference over other creditors of the firm and of Howard E. King. The plaintiff insists that such a transaction is within the section of the bankruptcy law above quoted, provided the defendant had reasonable cause to believe that it was intended thereby to give it a preference over other creditors. It is conceded that Paddock was an accommodation indorser, and that H. E. King & Son, although they were second indorsers, could not enforce the note against Paddock. This being so, still King & Son had some rights, and they could insist upon Paddock's either paying the note or returning the securities. The difficulty with the plaintiff's contention, however, it seems to me, is that Paddock was absolutely bound to pay, the moment he indorsed, if the note went to the hands of any other person than King & Son, because he waived demand and notice of protest. It was as though the note had been transferred to the defendant and had become due, and it had been presented for payment and payment refused, and a notice of protest duly served upon Paddock. Thereupon the rights of all parties changed. Paddock became liable to pay the note, and had the right to retain the securities to reimburse him. I think it must be admitted that if a bankrupt, within four months of the filing of his petition, goes to an innocent person and gives him security for the accommodation indorsement of his note, there is such consideration flowing from the act of indorsement that, notwithstanding the subsequent bankruptcy within the limit, the indorser can hold the securities to the extent of reimbursing himself for the amount of the note which he has become liable to pay. The bankruptcy law cannot mean that such a transaction is within its inhibition. There is no proof that Paddock had any reason to believe that King intended to give the defendant a preference, or that the defendant intended to obtain a preference. On the contrary, he believed that King was entirely solvent, and was willing to indorse his note for this large amount without being secured. He is not made a party to this action. He has received but $10,050 of the $12,064.35 for which he is liable. The security is his, to the extent of the amount of the note, and the proceeds belong to him, to help save himself from loss. The proceeds have never been turned over to the defendant. The note still remains unpaid. He was worth the amount of the note at the time he indorsed. Suppose the court could decree that the defendant should pay to the plaintiff the proceeds of the securities. There is no way that the court could compel the defendant to release Paddock from his contract of indorsement made good by protest. It is true that Paddock deposited the proceeds in the bank of the defendant, but that was the bank in which he did business. The proceeds were mixed with his other moneys. He instructed the bank to charge up the note to his account, if they must, but he would prefer more time to make up the balance beyond that realized from the securities.

This does not appear yet to have been done, but that is a matter between the defendant and Paddock, and with which this plaintiff has no concern. The fact that it has not been done is simply a circumstance in plaintiff's favor, but is insufficient to uphold his contention. What the plaintiff asks is that the court take Paddock's securities away from him, or that the defendant pay the amount of those securities, and look to Paddock for the whole amount of the note. I do not think this can be done; nor do I think that the decision of the appellate division in this case decides that it can be done. The appellate division passed upon the sufficiency of the complaint. It held that the complaint stated a good cause of action, but the complaint nowhere alleged that Paddock had become charged by protest with the payment of the note. So far as appears from the complaint, the note had not become due, and Paddock had not been charged with its payment by protest. If the defendant held the note not due, and Paddock held the securities, and had not been charged as indorser with its payment, it might well be that the plaintiff, as trustee of the Kings, could step in and say that the transaction was such that no one but the defendant, which had received the secured paper, could be harmed, and that therefore the defendant must surrender it, which would operate as a surrender of the securities for the benefit of the bankrupt estate. As I view it, this is all that the appellate division decided. On the issue as to whether the allegations of the complaint were good or not, this was all it could decide. What the rights of the plaintiff were, after Paddock had been charged with payment of the note by protest, the appellate court was not called upon to, and did not, decide.

With respect to the $2,625.13 overdraft the position of the plaintiff is still worse. On the 4th day of February, 1899, H. E. King & Son were indebted to the defendant in that amount for overdrafts. Howard E. King had another son, John H., not his partner. John H., for the purpose of helping his father and his firm, made his own note to one Thompson for $3,100, due in six months. Thompson indorsed the note, John H. giving him security therefor from his own funds. John H. then gave this note to his father, or procured it to be discounted for his benefit at the defendant bank, and with the proceeds of which said overdrafts were paid. After this had been done, John H. asked his father for security, inasmuch as he himself had secured Thompson, and thereupon Howard E. King assigned to John H. a mortgage as security. So far as the defendant is concerned, it had only the note made by John H. King and indorsed by Thompson. The assignment of the mortgage to John H. was not until after the defendant had received the note and discounted it. None of the officers of the bank, except Howard E. King, suggested that this be done, or knew anything of its being done until after it had been accomplished. In any view, I do not see how the defendant is liable for the value of the mortgage assigned by Howard E. King to John H., or for the value of the note made by John H. and indorsed by Thompson. Nor do I think that the evidence warrants me in holding that the defendant had reasonable cause to believe that it was intended by the transactions to give it a preference over the other creditors

of Howard E. King and H. E. King & Son, unless it shall be held that the knowledge of Howard E. King, the president of the defendant bank, was knowledge of the bank itself. Mr. Marshall was the practical manager of the bank, and the board of directors was composed of men engaged in more or less active business in the village of Malone. Howard E. King was an elderly man, and for a great many years had been one of the leading business men of the town. He was reputed to be wealthy. In addition to a considerable mercantile business, he was the owner of a business block, a fine residence, and other real estate. He had stock in local institutions of the town, and had been a hop buyer, in addition to his other business. He was one of the organizers of the defendant bank. He and his firm had had large financial dealings with the defendant, and had a large line of discounts. Dealings of the defendant with the Kings had been on rather too easy lines, but they were of the character that frequently occurs when an institution supposes it is dealing with a man of entire responsibility. The subject of discounts of the Kings at the defendant bank had been discussed before the board of directors, and King had stated that he had enough property to pay all his debts and leave a handsome sum to live upon in his old age. When the King property came to be sold, and the assets marshaled for the purpose of paying debts, there was a very large deficiency. But, in determining the question as to whether or not the defendant's officers had reason to believe the Kings were insolvent, we cannot take a retrospective view, but must look at the condition as it existed at the time. It is quite easy to see after the crash has come what a mistaken view we had of the financial standing of a business man, who has been long a part of the business community of a small town, especially when his dealings had been honorable, and he had been actively identified with the larger interests of the vicinity. It is not unusual that in a small community a prominent business man is greatly overrated. This is evidenced by the fact that Paddock, who was a lawyer in active practice, and had been district attorney of the county, and more or less acquainted with King's affairs, had no hesitancy in indorsing King's note for a large amount without security. I think it reasonable to say that, while the judgment of some may have been that the Kings were being allowed too much credit at the defendant bank for safety, yet none of the officers of the defendant had any real belief that Howard E. King or King & Son were actually insolvent at the time of the various transactions. The demand from the comptroller of the currency that certain discounts be put in different shape was sufficient to call upon them for activity. But I do not believe that that activity was the result of fright as to the solvency of the Kings.

I do not think Howard E. King himself, however, can be said to have been ignorant of his true financial situation; and if knowledge as to his own private affairs in his dealings with the defendant bank can be said to be knowledge of the defendant corporation, because he was its president, a different proposition is presented. Ordinarily knowledge of the chief officers of a corporation is knowledge of the corporation itself. Where the corporation is governed by a board

of managers or directors, the knowledge of the officer is imputed to the corporation, because it is presumed that the officer, working in the interest of the corporation, communicates his knowledge to the corporation itself. This rule of the law is an outgrowth of the principles governing agency. Knowledge of the agent while engaged in the business of the principal, from business necessity, is deemed the knowledge of the principal. When the agent ceases to act in the business of his principal, knowledge which he acquires is not the knowledge of the principal; and when the agent ceases to act for the principal, and acts in his own interest and contrary to his agency, then his acts cease to be those of the principal, and become his own. Knowledge of an officer or agent is knowledge of the corporation only when he is acting in the scope of his authority in transactions conducted in behalf of the corporation. Cragie v. Hadley, 99 N. Y. 131, 1 N. E. 537. Knowledge of any officer of a corporation is not always knowledge of the corporation itself. This is illustrated by the rule that notice to an individual director who has no duty to perform in relation to the matter cannot be considered notice to the corporation. Fulton Bank v. New York & S. Canal Co., 4 Paige, 127. And knowledge obtained by an officer of a bank while not acting officially for the bank cannot operate to its prejudice, and will not be imputed to it. Bank v. Clark, 139 N. Y. 307, 34 N. E. 908; Bank v. Same, 139 N. Y. 314, 34 N. E. 910. King was not an officer of the bank charged especially with the business of inquiring into his own solvency, and thereby determining whether or not the bank should continue its loans to him or grant him further discounts. If it be said that it was his duty to communicate his financial condition to the bank, because he was the president of it, the concealing of his insolvency was in his own interest and for his own benefit, and not for the benefit of the corporation. Just as soon as the agent forms the purpose of dealing with his principal's property for his own benefit and advantage, he ceases in fact to be an agent acting in good faith for the interest of his principal; and his action thereafter, based upon such purpose, is to be deemed in fraud of the rights of his principal, and the presumption that he has disclosed all the facts that have come to his knowledge no longer prevails, and his knowledge is not imputed to his principal. Benedict v. Arnoux, 154 N. Y. 715, 49 N. E. 326; Thomson-Houston Electric Co. v. Capitol Electric Co., 12 C. C. A. 643, 65 Fed. 341. Where an officer is concerned in his own private affairs, and the transaction is one in which he is dealing with a company as a third party in his own behalf, and acting for himself with the company, knowledge which he may have acquired is not imputed to the corporation. Insurance Co. v. Bell, 22 Barb. 62; Bank v. Neass, 5 Denio, 337. In the case of Bank v. Neass, the court says:

"It is not true as a legal proposition, that because Mercer, the cashier, was at the time the financial agent of the plaintiffs [the bank], that therefore they were chargeable with the knowledge he may have had on the subject. He was not acting as cashier in the procurement of the note. It was his own individual business, and he was engaged, like any other dealer with the plaintiffs, to procure the means of paying his debt and sustaining his credit. He can in no sense be considered the agent of the plaintiffs in the transaction,

and they were not in legal identity with him, either as to his acts or his information in respect to it."

My conclusion is that the knowledge of Howard E. King as to his own financial condition and the financial condition of his firm cannot, as matter of law, be imputed to the defendant. There was no such knowledge on the part of any other officers of the bank as to the insolvency of the Kings as led them to have reasonable cause to believe that it was intended to give the defendant, by the transactions which were had, a preference over the other creditors. It transpires that by the various transactions the defendant has saved its claim, and that other creditors have had a very small share. But after a very careful perusal of the voluminous briefs of counsel, and a painstaking consideration of the case, I am forced to the conclusion that the plaintiff has no remedy against the defendant. The complaint must be dismissed, with costs payable out of the fund in the hands of the plaintiff. A decree may be prepared setting forth the grounds of the decision in accordance with the foregoing.

Complaint dismissed, with costs.